UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MIRRORLITE MIRROR, INC.,

           Plaintiff,

        -against-

GLASSLESS MIRROR MANUFACTURERS INC.,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 06/23/2026

23-cv-3437 (LAK)

## MEMORANDUM OPINION GRANTING
## PERMANENT INJUNCTION
## (CORRECTED)

Appearances:

Christopher Andrew Colvin
James R. Hastings
Jeffrey A. Lindenbaum
PRACTUS, LLP

*Attorneys for Plaintiff*

Tatsuya Adachi
Lori Leigh Cooper
Robert M. Isackson
LEASON ELLIS LLP

*Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

      In the 1960s, an enterprising New York-based company named Hudson Photographic Industries, Inc. began selling a special type of mirror – one made without glass. These glassless mirrors were both lightweight and shatterproof. To describe them, the company trademarked the term "MirrorLite."

One can still buy a MirrorLite glassless mirror today. But not one made by Hudson Photographic. That firm went bankrupt and closed in 2007, teeing up a battle over the rights to the MirrorLite brand that – nearly two decades later – has finally made its way into a courtroom.

The plaintiff – initially called Hudson Mirror, LLC, but since 2011 named MirrorLite Mirror, Inc. ("MLM") – was founded by a group of former employees of Hudson Photographic and was the first to appropriate the abandoned MirrorLite trademark. Within a year and a half, however, relations soured within MLM's ranks. Two former Hudson Photographic employees quit to start a competing glassless mirror firm, the defendant here. Unwilling to cede all the goodwill associated with MirrorLite to the plaintiff, the defendant adopted its mirror image: LiteMirror.

The plaintiff then waited nearly 15 years to sue the defendant. Having finally done so in 2023, the plaintiff now seeks to prohibit the defendant from using "LiteMirror" to market glassless mirrors. For the reasons that follow, the Court declines to go that far – but agrees that a narrower permanent injunction is warranted.

**Facts**

*A.    The Parties and Products*

The plaintiff and the defendant are two companies based in Westchester County, New York.[1] MirrorLite Mirror, Inc., formerly known as Hudson Mirror, LLC ("Plaintiff" or "MLM"), was founded in March 2007; Glassless Mirror Manufacturers, Inc. ("Defendant") was founded around August 2008.[2] Both sell glassless mirrors of various sizes that are made by applying a

---

[1] Stipulations of Fact (Dkts 135, 138) ¶ 23 [hereinafter "Stip."].

[2] Stip. ¶¶ 7, 41.

3

reflective film to a lightweight backing.[3]  The parties are direct competitors who sell their essentially identical products to the same classes of consumers using the same or similar trade channels.[4] Plaintiff operates under the brand MirrorLite, while Defendant operates under the brand LiteMirror.[5] In April 2023, Plaintiff sued Defendant for trademark infringement.  That sums up the essence of this case, but significant additional background is necessary to put the dispute in context.

### B.    Pre-2007:  Hudson Photographic

Mirrorlite Products, Inc., Kamar Products, Inc., and Hudson Photographic Industries, Inc. (collectively, "Hudson Photographic") were a family of companies based in New York and owned by Eugene Martinez.[6]  Starting in the 1960s, Hudson Photographic manufactured and sold glassless mirrors under the trademark MirrorLite.[7]  The companies affixed labels to the backs of its glassless mirrors that said "MIRRORLITE" at the top and "Mirrorlite Products, Inc." below it.[8]

---

[3]

Exhibit 102 at ¶¶ 33, 75 [hereinafter "Rodriguez Decl."]; Exhibit ZA at ¶ 40 [hereinafter "Powers Decl."].

[4]

Stip. ¶¶ 25, 26, 60.  The parties customers include gyms, schools, theaters, restaurants, dance studios, home owners, horse arenas, students, architects, contractors, and others.  *Id.* ¶ 60. The parties sometimes make or attempt to make sales by submitting bids on construction projects.  Rodriguez Decl. ¶ 78.

[5]

For ease of reference, the Court will refer to the relevant marks throughout the opinion as "MirrorLite" and "LiteMirror."  The capitalization and other visual characteristics of the marks will be addressed as relevant.

[6]

Stip. ¶¶ 28, 29.

[7]

*Id.* ¶ 29

[8]

*Id.* ¶ 31.

4

Hudson Photographic owned a trademark registered with the U.S. Patent and Trademark Office ("PTO") for the use of MirrorLite in connection with the sale of plastic, flexible, metal coated film.[9] That registration identified February 4, 1970, as the mark's date of first use in commerce.[10]

Martinez died in 2006.[11] Hudson Photographic filed for bankruptcy and closed in February 2007.[12]

## C.    Founding of Plaintiff in March 2007

Gary Reith,[13] his wife Janet Reith, Richard Powers, and Benito Repollet all worked for Hudson Photographic.[14] In March 2007, shortly following Hudson Photographic's closure, Gary Reith founded Plaintiff.[15]  It began selling the same glassless mirror products that Hudson Photographic previously sold, including to some of the same customers and using some of the same distributers and dealers.[16]  Janet Reith, Dwayne Reith (Gary's brother), Repollet, and Powers were

---

[9]      *Id.* ¶ 33.

[10]     *Id.* ¶ 34.

[11]     *Id.* ¶ 27.

[12]     *Id.* ¶¶ 5, 27.

[13]     Gary Reith died in 2019.  *Id.*  ¶ 20.

[14]     *Id.* ¶ 4.

[15]     *Id.* ¶ 7.

[16]     Exhibit 100 at ¶ 10 [hereinafter "Janet Reith Decl."]; Exhibit 101 at ¶ 9 [hereinafter "Dwayne Reith Decl."].

5

among the people that Gary Reith invited to help start the company.[17]  Repollet oversaw quality control and Powers served as plant manager.[18]

Plaintiff always has used the mark MirrorLite in connection with the sale of its glassless mirrors throughout the United States.  Beginning in March 2007 and continuing through the present day, and with the exception only of a small handful of products sold through a particular distributor, Plaintiff has affixed a label bearing the MirrorLite mark to the backs of its products.[19] One of the stickers that Plaintiff applied to its products beginning in March 2007 resembled in all material respects the sticker pictured in Plaintiff's Exhibit 8.

Beginning around September 2008, Plaintiff shipped its products with protective packaging that referred to the product as a "MIRRORLITE® panel."[20]  Hudson Photographic designed and used the same packaging, which Plaintiff adopted it as its own.[21]

The record contains no bill of sale, assignment, or other instrument transferring any rights in the MirrorLite mark from Hudson Photographic to Plaintiff.[22]

---

[17] Janet Reith Decl. ¶¶ 2-3; Dwayne Reith Decl. ¶¶ 2-3, 10; Powers Decl. ¶¶ 24; Exhibit ZB at ¶ 16 [hereinafter "Repollet Decl."]

[18] Powers Decl. ¶ 25.

[19] Janet Reith Decl. ¶¶ 23-27; Rodriguez Decl. ¶ 41-43; Dwayne Reith Decl. ¶¶ 19-27.

[20] Trial Tr. 27:10-16; Exhibit 46.

[21] Trial Tr. 28:11-16.

[22] Stip. ¶ 39.

6

D.      *Founding of Defendant in August 2008*

At some point in 2007, Gary Reith had discussed with Repollet and Powers the possibility of their becoming partial owners of Plaintiff.[23]   Repollet and Powers subsequently operated under the assumption that they were partial owners.[24]  But sometime in July 2008, Repollet overheard a conversation among Gary Reith, Dwayne Reith, and the landlord of Plaintiff's factory that left Repollet with the impression that he and Powers were not, in fact, partial owners of Plaintiff.[25]  A conversation with the landlord later that same day confirmed those suspicions in his mind.[26]

After Repollet told Powers what he had overheard, the pair decided to resign from Plaintiff and open their own company that would sell glassless mirrors.[27] Defendant was incorporated on July 31, 2008, and Powers and Repollet submitted their resignations from Plaintiff on August 4 and 5, 2008, respectively.[28]  Defendant made its first sale on August 15, 2008.[29]

Defendant always has used the term "LiteMirror" to identify itself in the marketplace, although its use of that term has increased over the years.  Defendant's employee email addresses

---

[23]     Trial Tr. 43:19-44:13.

[24]     Powers Decl. ¶ 27; Repollet Decl. ¶ 16.

[25]     Repollet Decl. ¶ 27.

[26]     *Id.*

[27]     *Id.*; Powers Decl. ¶ 30.

[28]     Stip. ¶¶ 11-12.

[29]     Powers Decl. ¶ 46.

always have incorporated "litemirror." Defendant used the email address "litemirror@optonline.net" as early as September 2008,[30] and placed that email address on at least one brochure it distributed to promote its products.[31] Since October 2008, Defendant's employees have used email addresses that end in "@litemirror.com," such as "rpowers@litemirror.com."[32]

In October 2008, Defendant launched a website at the URL "www.litemirror.com" and began promoting its products there.[33] Repollet registered that domain on July 16, 2008, while he still was working for Plaintiff.[34] Defendant uses the same website today.[35]

Between 2008 and 2017, Defendant affixed to its products a cleaning sticker that resembled in all material respects the picture depicted in Exhibit VVVV.[36] The only reference to LiteMirror on the sticker was the listing of Defendant's website address, www.litemirror.com, in the bottom right hand corner.

---

[30] Powers Decl. ¶ 56; Repollet Decl. ¶ 51; Exhibit E.

[31] Powers Decl. ¶ 59; Exhibit UUUU.

[32] Powers Decl. ¶ 55; Repollet Decl. ¶ 51.

[33] Repollet Decl. ¶ 51.

[34] *Id.* ¶ 32.

[35] *Id.* ¶ 58.

[36] Exhibit ZC at ¶ 16 [hereinafter "Centofanti-Powers Decl."]; Powers Decl. ¶ 58; Trial Tr. 146:7-12.

8

Starting in late 2008 or early 2009, Powers referred to the defendant company as "LiteMirror, GMM" when answering the office phone.[37]

Part of Defendant's initial strategy when it was formed in 2008 was to find ways to reach customers who were looking for, or who had been customers of, Hudson Photographic.[38] In March 2009, Defendant purchased the website URL "www.mirrorliteproducts.com."[39] Hudson Photographic had used the same website domain to advertise its products.[40] This domain redirected to Defendant's website for many years, including as recently as 2023.[41] After the filing of this lawsuit, Defendant severed the link between "www.mirrorliteproducts.com" and its website on the advice of counsel.[42]

### E.    Plaintiff's PTO Registration

Plaintiff applied to register MirrorLite on December 23, 2008.[43] After its application initially was denied in March 2009 due to its similarity to Hudson Photographic's registration,

---

[37] Powers Decl. ¶ 61.

[38] Repollet Decl. ¶¶ 54, 64.

[39] *Id.* ¶ 64.

[40] Stip. ¶ 32.

[41] Repollet Decl. ¶ 65.

[42] *Id.*

[43] Stip. ¶ 49.

9

Plaintiff asked the PTO to cancel Hudson Photographic's registration, and that registration was cancelled in January 2010.[44]

The PTO accepts both "use" (meaning the trademark is already being used)  and "intent to use" (meaning the applicant has a good faith intention to use the mark in the future) applications.[45]  Plaintiff's December 2008 filing was an "intent to use" application.[46]  In November 2010, Plaintiff filed a statement of use asserting that it had first used MIRRORLITE in commerce at least as early as August 4, 2008.[47]

The PTO approved Plaintiff's registration on January 18, 2011.[48]  The registration covers plastic, flexible, metal coated film for commercial, non-commercial, industrial, or non-industrial purposes.[49] Also in 2011, Plaintiff changed its name from Hudson Mirror, LLC to MirrorLite Mirror, Inc.[50]

On April 17, 2023, Plaintiff filed a declaration of incontestability pursuant to 15 U.S.C. § 1065.[51]

---

[44] *Id.* ¶ 52; Exhibit GG; Exhibit JJJJJ.

[45] 15 U.S.C. § 1051(a), (b).

[46] Rodriguez Decl. ¶ 31.

[47] Exhibit 41.

[48] Stip. ¶ 51.

[49] *Id.* ¶ 45; Exhibit 7.

[50] Stip. ¶ 8.

[51] Exhibit 40.

### F.     Plaintiff Threatens Defendant with Litigation

Plaintiff has been aware of Defendant's existence since 2008.  Between November 2008 and April 2009, Plaintiff sent Defendant a series of letters threatening or appearing to threaten litigation.

In a letter dated November 14, 2008, Gary Reith instructed Defendants immediately to stop production of glassless mirrors and shutdown its website, which he claimed contained propriety information belonging to Plaintiff.[52]  In a letter dated January 26, 2009, a law firm claiming to represent Plaintiff instructed the Defendant to "cease any use of the MIRRORLITE trademark."[53]  The law firm followed up in a letter dated February 18, 2009, and again instructed Defendant to "cease and [sic] use of the MIRRORLITE trademark."[54]

A letter dated April 1, 2009, and sent by Gary Reith, bore the subject line "Re: - http://www.litemirror.com/ - Trade Mark infringement."[55]  The letter instructed Defendant that the use of "Mirrorlite[TM]" or "Mirrorlite Products" in any promotional material without a license from Plaintiff was prohibited.[56]  The same month, one of Plaintiff's distributors emailed Gary Reith to tell him that the distributor had "almost lost an order to LiteMirror."[57]

---

[52]     Exhibit 1.

[53]     Exhibit 56.

[54]     Exhibit 55.

[55]     Exhibit 54.

[56]     *Id.*

[57]     Exhibit CC.

11

After the April 2009 letter, Plaintiff did not follow up until August 2021, when an attorney representing Plaintiff wrote a letter to Defendant directing it to stop its use of LiteMirror.[58] Defendant responded in October 2021, accusing Plaintiff of raising the same unmeritorious claims it had raised in 2008 and 2009.[59]

G.    *Defendant's Increasing Use of LiteMirror Between 2008 and Present*

As noted above, Defendant always has used LiteMirror in some form. But Defendant significantly increased its use of LiteMirror over the years.

Defendant has maintained Facebook, Twitter (now X), and YouTube pages since 2010 that identified itself as "LiteMirror," "@LiteMirror," and "@LiteMirror,"  respectively.[60] Defendant referred to its products as "LiteMirrors" on Twitter as early as 2010.[61]  Defendant then started referring to its products as "LiteMirrors" or "LiteMirror" on its website as early as 2013.[62]

In November 2017, Defendant rebranded its website.[63]  Previously, only "Glassless Mirror Manufacturers" had appeared prominently at the top of the page.[64]  After the redesign,

---

[58]     Powers Decl. ¶¶ 77, 80; Exhibit 20.

[59]     Exhibit LLLLL.

[60]     Centofanti-Powers Decl. ¶ 12.

[61]     Exhibit HHHHH.

[62]     Powers Decl. ¶¶ 62-64; Exhibits 57-58, 61.

[63]     Centofanti-Powers Decl. ¶ 22.

[64]     Exhibit 2.

12

"LiteMirror.com" appeared prominently at the top of the page.[65]  By at least February 2020, Defendant had updated its website again, changing "LiteMirror.com" to "LiteMirror" at the top of the page.[66]

In December 2020, Defendant declared "LiteMirror" to be an "assumed name" in a filing with the New York Secretary of State.[67]

## Discussion

The Court tried the case without a jury.  Plaintiff ultimately pressed three claims: (1) false designation of origin under Section 43(a) of the Lanham Act;[68] (2) common law trademark infringement under New York law, and (3) trademark infringement under Section 32(1) of the Lanham Act.[69]  Plaintiff seeks only injunctive relief.

Section 32(1) of the Lanham Act protects certain trademarks that have been registered with the PTO, while Section 43(a) protects certain trademarks that have been used in commerce regardless of whether they have been registered.[70]  The same legal standard generally

---

[65] Exhibit RRR.

[66] Exhibit ZZZ.

[67] Exhibit 26.

[68] 15 U.S.C. § 1125(a)(1)(A).

[69] 15 U.S.C. § 1114(1).

[70] *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

governs both claims.[71]  A court must determine, first, "whether the plaintiff's mark is entitled to protection," and second, whether defendant's use of an allegedly infringing mark is "likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."[72]

The parties agree that the law governing Plaintiff's common law trademark infringement claim is "virtually identical" to the Lanham Act standard, with the exception of New York law requiring an additional showing of bad faith by the defendant.[73]

Before turning to Plaintiff's claims, the Court addresses – and rejects – Defendant's affirmative defense of laches.

## I.      Laches

Plaintiff's claims for equitable relief are subject to equitable defenses.  One of those defenses is "laches," which requires a defendant to "prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action."[74]  Defendant has raised that defense here, arguing that Plaintiff knew about its allegedly infringing conduct since 2008 yet failed to sue until 2023, by which time Defendant had invested significant time and money into building the LiteMirror brand.

---

[71] *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).

[72] *Id.*; *see 1-800-Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 246 (2d Cir. 2024).

[73] Stipulations of Law (Dkts 135, 138) ¶17 (quoting *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 397 (S.D.N.Y. 2021)).

[74] *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002) (quoting *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir.1996)).

To prevail on a defense of laches, however, a defendant "must come with clean hands," or in other words must have acted in good faith.[75]  In the trademark context, the good faith inquiry focuses on "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."[76]  A laches defense, therefore, will not succeed "when the defendant intended the infringement,"[77] because a defendant's intentional infringement is "a dispositive, threshold inquiry that bars further consideration of the laches defense, not a mere factor to be weighed in balancing the equities."[78]

The Court finds that Defendant acted in bad faith.  The record makes clear that Defendant adopted LiteMirror with the intention of profiting from the goodwill of the MirrorLite mark, despite knowing that Plaintiff had a senior claim to that mark. Three pieces of context inform this finding.  First, Repollet and Powers were aware that Plaintiff had adopted the MirrorLite mark and therefore had a senior claim to that mark.  Second, Repollet and Powers left Plaintiff's employ after a falling out with Gary Reith and intended to compete directly with Plaintiff in the same market for the same products. Third, Repollet and Powers avowedly sought to attract customers familiar with Hudson Photographic's MirrorLite-branded products.

---

[75]

*Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).

[76]

*Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991).

[77]

*Hermès Int'l*, 219 F.3d at 107 (quoting *Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 644 F.2d 946, 950 (2d Cir. 1981)).

[78]

*Id.*

15

In these circumstances, the Court finds that Defendant's adoption of LiteMirror – a mark that no more than transposes the two words that comprise Plaintiff's mark – was a deliberate attempt to ride the coattails of the MirrorLite brand and thereby gain a competitive advantage as a new player in the glassless mirror market. The Court does not find credible Repollet's claim to have conceived of the term LiteMirror solely as a descriptive for a lightweight mirror. The similarity between MirrorLite and LiteMirror immediately strikes anyone who hears or reads those terms, and Repollet and Powers were well aware both of the history of the MirrorLite mark and of Plaintiff's prior adoption of it. The adoption of such a similar name was no mere coincidence.[79] Accordingly, Defendant's laches defense fails.

## II.       Section 43(a): False Designation of Origin

Section 43(a) prohibits the use of any "word, term, name, symbol, or device" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person."[80] This provision protects trademarks regardless of whether they are registered with the PTO.[81]

---

[79] *See Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960).

[80] 15 U.S.C. § 1125(a)(1)(A).

[81] *Two Pesos*, 505 U.S. at 768.

A.      *Validity of MirrorLite Mark*

To be protected under Section 43(a), a purported trademark must be "capable of distinguishing the products it marks from those of others."[82] In that regard, there are five categories of marks:  generic, descriptive, suggestive, arbitrary, and fanciful.[83]

Generic terms and descriptive marks are not considered inherently capable of identifying a product's source.  A generic term, like automobile or aspirin, never is entitled to trademark protection.[84]  A descriptive mark "describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put."[85]  It is protected as a trademark only once it acquires "a secondary meaning, that is say, an identity that consumers associate with a single source."[86]  Furthermore, even if a descriptive term has acquired secondary meaning by the time a lawsuit is filed, a plaintiff may not "prevent the use of that term by one whose use had begun before the secondary meaning was acquired."[87]

Suggestive, arbitrary, and fanciful marks are considered "inherently distinctive" and receive protection without proof of secondary meaning.[88] A term is suggestive "if it merely suggests

---

[82]
> *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999).

[83]
> *Id.*

[84]
> *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993).

[85]
> *Lane Cap. Mgmt.*, 192 F.3d at 344.

[86]
> *Gruner*, 991 F.2d at 1076.

[87]
> *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980).

[88]
> *Lane Cap. Mgmt.*, 192 F.3d at 344.

the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods."[89]  An arbitrary mark "applies a common word in an unfamiliar way,"[90] like "Ivory" for soap.[91]  A fanciful mark "is not a real word at all, but is invented for its use as a mark,"[92] like "Exxon" for oil products or "Kodak" for photography equipment.[93]

MirrorLite is not a generic term for glassless mirrors.  Nor is MirrorLite an arbitrary use of a word with an unrelated meaning.  Plaintiff nevertheless argues that MirrorLite is fanciful because it was invented for its use as a mark.  But a term is not fanciful just because it does not appear verbatim in a dictionary.[94]  MirrorLite is merely a compound of two words with commonly understood meanings and thus bears no resemblance to a genuinely fanciful term like Exxon.

The closer issue is whether MirrorLite is descriptive or suggestive.  This presents a factual question concerning "how the purchasing public views the mark."[95]  "Mirror" is a generic term for the type of product Plaintiff sells.  "Lite" is used to designate "a manufactured product that

---

[89]     *Id.*

[90]     *Id.*

[91]     *Gruner*, 991 F.2d at 1076.

[92]     *Lane Cap. Mgmt.*, 192 F.3d at 344.

[93]     *Gruner*, 991 F.2d at 1076.

[94]     *See, e.g.*, *id.* at 1076 (citing cases that found "COCO-QUININE" descriptive of chocolate-flavored quinine and "FASHIONKNIT" descriptive of sweaters).

[95]     *Lane Cap. Mgmt.*, 192 F.3d at 344.

is lighter (in weight, calorie, fat content, etc.) than the ordinary variety" or "a simplified or moderated version of something."[96]   In Plaintiff's mark, "lite" modifies "mirror" and thereby indicates that the product is a mirror that is in some way lighter, simpler, or more moderated than an ordinary mirror.  The question is whether the connection between "lite" and a glassless mirror "is direct enough that the term may be categorized as descriptive or whether the connection is more indirect, requiring categorization as suggestive."[97]

If Plaintiff's mirrors were special only by reason of their light weight, MirrorLite surely would be a descriptive mark.  But Plaintiff's products are special also in a different way – they are made without glass, the material most commonly associated with a mirror.  A glassless mirror has the advantage of being shatterproof in addition to being lightweight.  As used in this context, and as demonstrated by the record in this case, the connection between "lite" and a glassless mirror is not direct enough to be categorized fairly as use of ordinary language to describe a product's features or qualities.  Bridging the gap between "MirrorLite" and a glassless mirror requires a degree of "imagination, thought and perception" that renders the mark suggestive.[98]

In any event, Defendant stipulated that Plaintiff is "currently the owner of all right, title, and goodwill associated with the trademark MIRRORLITE in connection with the advertising and sales of glassless mirrors."[99]  And only after trial did Defendant argue that Plaintiff had failed

---

[96] *Lite*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/lite_combform2 (last visited May 1, 2026).

[97] *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir. 1992).

[98] *Id.* (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976).

[99] Stip. ¶ 44.

19

to prove that MirrorLite had acquired secondary meaning by the time of Defendant's adoption of LiteMirror.  The Court interprets Defendant's stipulation as a concession that MirrorLite is – and at all times relevant to this litigation, was – a protectable trademark as used by Plaintiff.

> B.      *Priority of Use*

To obtain trademark rights in a mark, a person must use the mark in the marketplace. The first person who uses a mark with the "intention to continue exploiting the mark commercially" earns the right to exclude others from using the same mark or any colorable imitation of it.[100]  This concept is known as "priority of use."  Applications of these principles here requires the Court to determine whether Plaintiff began using MirrorLite before Defendant began using LiteMirror.

As the Court's earlier factual findings demonstrated, Plaintiff adopted MirrorLite as a trademark before Defendant even existed.  From March 2007 onwards, Plaintiff applied a MirrorLite sticker to the back of its mirrors.  The Court credits the testimony of Janet and Dwayne Reith, and Stephanie Rodriguez, regarding the use of the MirrorLite mark in 2007 and 2008. Plaintiff's immediate adoption of MirrorLite fits with Plaintiff having been founded effectively to continue the business of Hudson Photographic by selling the same products to many of the same customers using the same distribution channels.  Dwayne Reith recalled with particularly convincing specificity that the MirrorLite sticker bore also information identifying the batch number of each product, information that would be used to identify that customer's order and warranty when necessary.

---

[100] *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974).

20

In contrast, the Court does not credit Repollet's and Powers's claims that Plaintiff never used MirrorLite to refer to its products while they were employed there between 2007 and 2008. Particularly unconvincing is Repollet's assertion that the stickers that Plaintiff placed on its mirrors back then resembled the sticker pictured in Exhibit RRRRR, which gives only Plaintiff's name (at the time, Hudson Mirror, LLC) and address. Such a sticker would have failed to provide the identifying batch information about which Dwanye Reith testified so convincingly and, even putting aside Reith's testimony, the Court finds its unlikely that Plaintiff would have sold its products without any such identifying information.

The fact that Defendant adopted LiteMirror, rather than MirrorLite, as its moniker also is circumstantial evidence that Plaintiff had begun using MirrorLite. If Defendant was interested in attracting former customers of Hudson Photographic – which Defendant attempted to do through, among other things, registering and using the domain "www.mirrorliteproducts.com" – and if Defendant knew Plaintiff had no claim to MirrorLite, then why did Defendant not just adopt MirrorLite itself?[101]

### C.    *Likelihood of Confusion*

The foregoing establishes that Plaintiff owns trademark rights in MirrorLite that it acquired prior to Defendant's adoption of a competing mark. Plaintiff still must demonstrate,

---

[101]

> When registering its trademark with the PTO, Plaintiff claimed that it first had used MirrorLite on August 4, 2008. Defendant argues that Plaintiff's proof of an earlier date of first use must be clear and convincing. Assuming that is true, the Court finds that the evidence of Plaintiff's use of MirrorLite since March 2007 is clear and convincing for the reasons already stated, including the Court's credibility determinations. Furthermore, Plaintiff would have priority over Defendant even based on the August 4 date, which Defendant concedes need have been proved only by a preponderance of the evidence, as Defendant does not claim to have used LiteMirror until 11 days after that.

however, that Defendant's use of LiteMirror "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person."[102] A court is to consider and weigh at least the eight so-called *Polaroid* factors to assess whether such a likelihood of confusion exists.[103]  Those factors are set out in subheadings below and addressed in turn, with an eye towards the several types of consumer confusion against which the Lanham Act is directed.[104]  But these factors are not exclusive and should not be applied mechanically.[105]  The ultimate, fact-intensive question is whether "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark."[106]

### i.     Strength of Plaintiff's trademark

A mark's strength depends on "its tendency to uniquely identify the source of the product."[107]  This inquiry turns on the degree to which the mark is inherently distinctive ("conceptual strength") and the degree to which the mark has attained distinctiveness in the

---

[102]

15 U.S.C. § 1125(a)(1)(A).

[103]

*Polaroid Corp. v. Polarad Elec*s. *Corp.*, 287 F.2d 492, 495 (2d Cir. 1961); *see 1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 247 (2d Cir. 2024).

[104]

*See Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 n.2 (2d Cir. 2005).

[105]

*Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995).

[106]

*Gruner*, 991 F.2d at 1077.

[107]

*Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005).

marketplace ("commercial strength").[108]  The conceptual strength of a mark refers to the extent to which it is inherently distinctive, with fanciful or arbitrary marks being the strongest, suggestive marks being the weakest type of inherently distinctive mark, and descriptive marks being not inherently distinctive at all.[109]  The commercial strength of a mark is assessed by reference to the same type of evidence that is used to show that a descriptive mark has obtained secondary meaning, namely, "(1) advertising expenditures; (2) consumers studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use."[110]

As previously explained, Plaintiff's mark is suggestive (and thereby inherently distinctive), "but just barely."[111]  The word "mirror" comprises one half of the mark and does nothing more than describe the product.  The modification of"mirror" by "lite" renders the mark suggestive, but "suggestiveness is not necessarily dispositive of the issue of the strength of the

---

[108]

*Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 287 (S.D.N.Y. 2018).

[109]

*See Star Indus.*, 412 F.3d at 385.

[110]

*Alzheimer's Disease & Related Disorders Ass'n*, 307 F. Supp. 3d at 289 (citing *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)).

[111]

*Star Indus*, 412 F.3d at 385.

mark."[112]  Arbitrary and fanciful marks are the only marks "that can be considered clearly strong

based exclusively on inherent distinctiveness."[113]  Suggestive marks at best are "moderately strong,"

but may be considered weak in light of other evidence.[114]

Plaintiff's showing of secondary meaning in this case was paltry.  It has used the

mark for nearly 20 years.  But Plaintiff presented virtually no evidence to corroborate that this has

given the mark commercial strength.  It introduced no evidence of advertising expenditures or

unsolicited media coverage and, significantly, produced no consumer studies.  Plaintiff claims

(without documentary support) to have sold more than $1 million worth of glassless mirrors every

year for the past 10 years.  But there is no evidence as to the overall size of the market for glassless

mirrors, significantly undermining the probative value of this figure.[115]

Plaintiff points to purported attempts to plagiarize the mark by Defendant and one

of Defendant's distributors.  That Defendant chose to adopt a similar mark weighs somewhat in

favor of Plaintiff on this factor, but it is still not as probative as would have been evidence of

counterfeiting of the MirrorLite mark itself.  Furthermore, the evidence at trial made clear that the

attempt by one of Defendant's distributors to register a trademark that contained the word

MirrorLite was driven at least in part by bad blood between that distributor and one of Plaintiff's

---

[112]  *Lang*, 949 F.2d at 581.

[113]  *Star Indus.*, 412 F.3d at 385 (citing *Virgin Enters.,* 335 F.3d at 147).

[114]  *Id.* at 385-86.

[115]  *Cf. N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 315 (S.D.N.Y. 2010) (considering that plaintiff's triathlon was the *only* Olympic distance triathlon run in the rivers, streets, and parks of New York City for the past ten years).

24

distributors.  The likely mixed motives behind this alleged plagiarization renders this evidence less probative of the question at issue here, i.e., whether the MirrorLite mark is so strong that others are attempting to profit off it.

In sum, Plaintiff's mark is barely suggestive, and the remaining evidence in the record (or lack thereof) leads the Court to conclude that the MirrorLite mark is relatively weak, weighing in favor of Defendant.

>     *ii.     Degree of similarity between the parties' marks*

To assess similarity, a court must "look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers."[116]  Among the similarities to consider are each mark's meaning, sound, and appearance.[117]  The test is not whether the products can be differentiated when viewed side-by-side.  Rather, a court must ask whether the marks "create the same general overall impression."[118]

Weighing significantly in favor of Plaintiff is the fact that MirrorLite and LiteMirror have essentially the same meaning and sound confusingly similar.  Both use "mirror" and "lite" to convey the message that the product being sold is a special kind of mirror – a glassless mirror.  And the parties agree that the "mirror" and "lite" syllables are pronounced identically in each party's

---

[116]    *Gruner*, 991 F.2d at 1078.

[117]    *See Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 552 (S.D.N.Y. 1996).

[118]    *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir. 2005) (quoting *Fun-Damental Too, Ltd. v. Germany Indus. Corp.*, 111 F.3d 993, 1004 (2d Cir. 1997)).

25

mark, with LiteMirror being nothing more than a transposition of the words in Plaintiff's mark. Substantial authority and common sense supports the proposition that the swapping of two words from one trademark to another is likely to cause confusion.[119]

As to appearance, Plaintiff has long placed a label on each of its mirrors that says "MIRRORLITE" in black ink against a white background in a standard font, without any other notable graphical features.  Its website includes in the upper left corner a logo in which "Mirror" appears above the word "Lite," with the M in "Mirror" reflected upside down immediately underneath itself and to the left of the word "Lite."   But elsewhere on Plaintiff's website, "MIRRORLITE®" and "MirrorLite®" appear in plain black letters.  Defendant's website displays at the top "LiteMirror" in a blue font with what appears to be a leaf dotting the "I" in "Lite." Defendant places a sticker on the back of its mirrors that says "LITEMIRROR."

Defendant focuses on the difference between the logos that appear on each party's website, but the marks "need not be identical . . . only similar."[120]  Even if a prudent observer could identify the differences between the logos when compared side-by-side, the overall impression left by the marks presentation in the market is highly similar.  Considering the context in which the marks appear, the Court finds that the sound and meaning of MirrorLite and LiteMirror are the primary drivers of the impression that would be left in the mind of consumers encountering those marks.  A person familiar with the labels that appear on the backs of Plaintiff's mirrors easily could be confused upon encountering Defendant's relatively plain logo, which uses the same words

---

[119] *See* Dkt 138 at 111-12 (collecting cases).

[120] *Louis Vuitton*, 426 F.3d at 538 n.3.

26

(transposed) to describe the same type of products.  "[E]specially when the comparison is between marks on identical product types," the marks need not be identical to create a likelihood of confusion.[121]

> ### iii.    *Proximity of the products and their competitiveness with one another*

It is undisputed that the parties – headquartered within 25 miles of each other – are direct competitors who sell the same type of products to the same classes of consumers.  Little more need to be said about this factor, other than to emphasize that it weighs in Plaintiff's favor.

> ### iv.    *Likelihood the prior owner may "bridge the gap" in the markets for the products*

This factor refers to the likelihood that a plaintiff will begin to sell in the same market in which the defendant operates.  Because the parties already sell identical products in the same market, this factor is irrelevant – it adds nothing beyond what is already captured by the third factor.[122]

---

[121]    *Id.*

[122]    Plaintiff notes that the Second Circuit at least once has suggested that this factor favors a plaintiff where the plaintiff and defendant already operate in the same market.  *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988).  But the Second Circuit more recently has said that this factor is "irrelevant" if "the parties' products are already in the same market."  *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 332 (2d Cir. 2020); *accord Star Indus.*, 412 F.3d at 387.  Because the *Polaroid* factors are non-exclusive and should not be applied mechanically, this discrepancy in the circuit caselaw is of no moment.  The third and fourth *Polaroid* factors require consideration of the current and likely future competitiveness and proximity of the parties' products.  Here, the Court accords significant weight to the fact that Plaintiff and Defendant sell identical products to the same types of consumers.

*v.*     *Evidence of actual consumer confusion*

Evidence that confusion "has actually occurred is of course convincing evidence that confusion is likely to occur."[123]  Such evidence can come in the form of consumer surveys or anecdotes,[124] and "evidence of actual confusion need not be limited to evidence of mistaken *completed* transactions."[125] Proof of actual confusion is not required to prevail on a trademark-infringement claim.[126]  But "[i]f consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion."[127]

Plaintiff presented only anecdotal evidence of confusion.  The Court credits some but not all of Plaintiff's evidence in this regard.[128] Plaintiff at most presented roughly two dozen instances of apparent confusion during the many years the company's products have been on the market together.  These anecdotes mostly involved someone emailing or calling one company while

---

[123]

    *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 141 (2d Cir. 1999).

[124]

    *See Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319 (S.D.N.Y. 2000).

[125]

    *Morningside Grp.*, 182 F.3d at 141.

[126]

    *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).

[127]

    *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999), *abrogated on other grounds by Mosely v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003).

[128]

    For example, some of Plaintiff's evidence involved inquires directed to, or orders placed with, one of Plaintiff's dealers that does business as GlasslessMirrors.com, which is very similar to Glassless Mirror Manufacturers, Defendant's incorporated name.  Any confusion caused by the similarity in those two names is not at issue here.

referencing the other's mark or name.  Plaintiff did not present the testimony of any of the people who sent those emails or made those phone calls.  Nor did Plaintiff present a single witness that testified to having purchased a LiteMirror product thinking it was a MirrorLite product.[129]

Plaintiff claims to have made more than $1 million in sales each of the past 10 years, yet presents just a handful of alleged instances of confusion each year.  A court may disregard such *de minimis* evidence of actual confusion.[130]  Moreover, without additional context from the people who made the misdirected inquires, the anecdotes in some cases may represent nothing more than fleeting inattentiveness or carelessness.[131]  Even crediting the anecdotes, Plaintiff did not present any consumer survey evidence, which itself is "evidence that actual confusion cannot be shown."[132]  In the context of this case, Plaintiff's meager evidence of actual confusion weighs in favor of Defendant.

---

[129] *See Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) ("There was no testimony by any consumer, retail or wholesale, who intended to buy a Merriam–Webster dictionary but mistakenly bought a Random House dictionary because of confusion between the two products' trade dresses. The lack of survey evidence counts against finding actual confusion.").

[130] *See, e.g.*, *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 589-90 (S.D.N.Y. 2015) (collecting cases).

[131] *See Codename Enters., Inc. v. Fremantlemedia North Am., Inc.*, No. 16-cv-1267, 2018 WL 3407709, at *10 (S.D.N.Y. Jan. 12, 2018).

[132] *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 964 (2d Cir. 1996).

29

*vi.      Defendant's good faith in adopting its imitative mark*

As previously explained, the question of a defendant's good faith turns on whether the defendant "adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." A finding that the defendant acted in bad faith gives rise to an inference that such copying "will indeed cause the confusion the defendant intended them to produce."[133] As Judge Learned Hand explained, "it is generally true that, as soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the 'make-up' of an earlier comer, we need no more . . . we are content to accept his forecast that he is 'likely' to succeed."[134]

For the reasons already stated above, the Court finds that Defendant adopted LiteMirror in bad faith, weighing in favor of Plaintiff.

*vii.      Quality of defendant's product compared with the plaintiff's product*

Plaintiff argues that Defendant's products are not the same quality as Plaintiff's products because only Plaintiff's products have been certified by Underwriters Laboratory. There is no evidence, however, that Defendant's products ever have failed, or that they could not meet, the test for certification by that organization. The mere fact that Defendant's products have not been so certified says nothing about their quality.

---

[133]

*Gruner + Jahr USA Pub. v. Meredeth Corp.*, 793 F. Supp. 1222, 1233 (S.D.N.Y. 1992); *see Mobile Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987).

[134]

*Am. Chicle Co. v. Topps Chewing Gum, Inc.*, 208 F.2d 560, 563 (2d Cir. 1953).

30

Plaintiff argues that this factor factors favors it even if the parties' products are of comparable quality because the Second Circuit has said that "[p]roducts of equal quality may tend to create confusion as to source because of that very similarity of quality."[135]  Plaintiff is correct that the Second Circuit seemingly has reasoned that this factor supports a plaintiff regardless of whether the quality of the defendant's goods is the same or worse.  Regardless, there is no evidence in this case, one way or another, regarding the comparative quality of the parties' products.  So although the Court certainly considers that the products are essentially identical in terms of function and design, it gives no extra weight to any possible similarity or dissimilarity in quality.

### viii.    Sophistication of the buyers

"Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product."[136]   If the market for a product includes "both discriminating and casual, relatively unknowledgeable buyers," "a court must give consideration to the probability of confusion on the part of the latter as well as of the former."[137]  At the same time,

---

[135]

*Morningside Grp.*, 182 F.3d at 142.

[136]

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992).

[137]

*Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971).

the likelihood of confusion question turns on whether "numerous"[138] or "an appreciable number of"[139] ordinarily prudent purchasers are likely to be misled.  And the sophistication of the buyers cannot be relied on to avoid a finding of likelihood of confusion when "there is a high degree of similarity between the parties' services and marks."[140]

The parties's products in some cases are common household items that start at $50. Their customers include homeowners and students.  At least some portion of the relevant customer base, therefore, is likely to be relatively unsophisticated.  But other customers seem likely to be more sophisticated.  For example, some customers are government or business entities and the parties sometimes compete for business through a formal bidding process.

The record ultimately contains no evidence regarding how many customers are more sophisticated and how many are less sophisticated.  In addition, Plaintiff presented no evidence from any consumer or expert regarding the amount of research or reflection that goes into purchasing a glassless mirror, even one priced at $50.  There is not even any evidence establishing where most of Plaintiff's sales take place – whether in brick-and-mortar stores or online.  Ultimately, the Court is unable to draw any meaningful conclusion regarding the extent to which the sophistication of the buyers contributes to the likelihood that an appreciable number of consumers will be misled.

---

[138] *Gruner*, 991 F.2d at 1077.

[139] *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978).

[140] *Moringside Grp.*, 182 F.3d at 143.

32

> ix.      *Balancing of the* Polaroid *factors*

Taking these factors together, whether a likelihood of confusion exists presents a close question.  Plaintiff's mark is relatively weak, and despite a long period of co-existence between the parities, Plaintiff failed to demonstrate more than a *de minimis* amount of actual confusion.  Ultimately, however, on the facts of this case the Court assigns more weight to the goods at issue being identical, the marks being confusingly similar, and Defendant having adopted LiteMirror in bad faith.  Thus, although Plaintiff has shown a sufficient likelihood of confusion to prevail, the risk of such confusion is not substantial.

## III.      *New York Common Law*

The parties agree that the standard of liability under New York law is the same as under the Lanham Act, with the exception of New York requiring a finding of bad faith.  Because Defendant is liable under the Lanham Act and acted in bad faith, Plaintiff prevails on its state-law claim.

## IV.      *Section 32(1): Trademark Infringement*

Thus far, with the exception of footnote 101, the Court's analysis has not addressed Plaintiff's federal registration of MirrorLite.  Registration of a trademark with the PTO confers on a registrant certain evidentiary and procedural advantages in a trademark suit, particularly where (as here) the registration has become "incontestible."[141]  Subject to limited defenses, an incontestible registration provides conclusive evidence that  a registrant owns and has the exclusive right to use

---

[141]      15 U.S.C. §§ 1115(b), 1065.

the registered trademark in commerce.[142]  Section 32(1) of the Lanham Act – the basis of one of

Plaintiff's claims to be adjudicated here – provides also an express cause of action for infringement

of a registered mark.[143]

Each registration of a trademark describes the goods or services in connection with

which the mark is used, and the protections afforded by such registration "extend[] only so far as

the goods or services noted in the registration certificate."[144]  Plaintiff's registration identifies the

goods as "[p]lastic, flexible, metal coated film," both for and not for "industrial or commercial

purposes."[145]  Plaintiff argues that this description encompasses the glassless mirrors that it sells as

finished products.  The Court disagrees.

To determine what the registration covers, the Court considers "the common

understanding of the language used to describe the goods."[146]  Plaintiff sells a finished product that

has a universally recognized name: a mirror.  The MirrorLite registration, however, unmistakably

describes only a raw material: a "metal coated film" for commercial, non-commercial, industrial,

or non-industrial "purposes."

---

[142]

  *Id.* § 1115(b).

[143]

  *Id.* § 1114(1).

[144]

  *Mushroom Makers*, 580 F.2d at 48; *see* 15 U.S.C. § 1115(b) ("Such conclusive evidence shall relate to the exclusive right to use the mark on or in connection with the goods or services specified in the affidavit filed under the provisions of section 1065 of this title . . . .").

[145]

  Exhibit 37; *see also* Exhibit 40 (describing the goods using identical language in declaration of incontestability).

[146]

  *In re Catto Creations, LLC*, No. 85092883, 2013 WL 3191202, at *2 (T.T.A.B. May 28, 2013) (citing *In re Gulf Coast Nutritionals, Inc.*, No. 77980412, 2013 WL 3001444 (T.T.A.B. Jan. 29, 2013)).

34

Plaintiff argues that the film *is* the mirror because the film is stretched onto a backboard and thereby serves as the reflective surface that makes the product a mirror. But that reasoning "collape[s] the distinction between registrations for raw materials and registrations for finished products."[147] A registration for "stones and beads for use in jewelry" does not cover jewelry made with those beads and stones.[148] And a registration for "steel in the form of metal powder and compacted metal powder and wrought products" – "namely wire, rod, bar, strip, billet, and other shapes" – does not cover "finished products," such as fences, fence posts, or barbed wire.[149] Here, the act of stretching the film onto, and merging it with, a backing transforms the film from something an English speaker would refer to as "film" into something an English speaker would refer to as "a mirror." No one ever would say, "You've got some dirt on your face. Go look in the metal-coated film."

Plaintiff attempts to analogize the difference between film and a mirror to the difference between a painting sold with or without a frame. This analogy is inapt because the act of placing a painting in a frame does not transform the painting from one commonly understood product to another. The difference between a spool of film and a finished mirror, in fact, is more like the difference between a can of paint and a painting. On Plaintiff's logic, a registration covering "blue paint" would cover also a canvas covered in blue paint. But receiving a can of paint is a consumer experience very different from receiving a painted canvas. The same is true of the

---

[147] *Coach, Inc. v. Citi Trends, Inc.*, No. CV 17-4775, 2019 WL 6354367, at *10 (C.D. Cal. Oct. 23, 2019).

[148] *In re Catto Creations, LLC*, 2013 WL 3191202, at *2.

[149] *In re Ameristar Fence Prods., Inc.*, Nos 77955361, 77955366, 2012 WL 1267941, at *2 (T.T.A.B. Mar. 19, 2012).

difference between receiving a film and receiving a mirror, even if the film is being acquired for purposes of creating a mirror.[150]

So, Plaintiff's registration does not cover mirrors. Of what consequence is that to the Section 32(1) claim? Plaintiff argues none, because "finished products and their components are routinely found to be confusingly similar in a trademark infringement context."[151] Plaintiff accurately states the law but fails to grapple with the fact that it does not sell film as a component part, has not that claimed that it intends to make such sales in the future, and therefore has presented no evidence regarding the nature of any component film product.[152]

---

[150]

Plaintiff urges the Court to consider that the PTO accepted as a required "specimen," 37 C.F.R. § 2.34(a)(1)(iv), a photograph of what appears to be the back of one of its glassless mirrors, Exhibit EEEEE. The exhibit on which Plaintiff relies was not introduced at trial. Even putting that aside, considering evidence of what the PTO examiner likely understood the registration to cover is a slippery slope for Plaintiff. Each registration classifies the goods or services to which the registration pertains. *See* 15 U.S.C. § 1112. Plaintiff's registration is identified as belonging to Classes 16 and 17 – not to Class 20, which includes "mirrors." 37 C.F.R. § 6.1. Classes 16 pertains to, among other things, "plastic sheets, films and bags for wrapping and packaging"; Class 17 pertains to, among other things, "plastics and resins in extruded form for use in manufacture." *Id.* The classification system exists "solely for administrative purposes, and does not affect the substantive rights of a mark's owner in any way." *Paty's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 269 (2d Cir. 2011). But if the classification that was before the trademark examiner is irrelevant to determining the registration's coverage, than so too must be the specimen that the examiner accepted. To consider one without the other would create an incomplete and potentially misleading picture of the PTO's purported understanding of the goods at issue.

[151]

Dkt 150 at 3.

[152]

Plaintiff's chief operations manager, Stephanie Rodriguez, testified that Plaintiff "do[es] not" sell film as a standalone product today, has never sold such a product in the United States, and only ever sold such a product around 2008 or 2009 to Mirrorlite Asia, located in Thailand. Trial Tr. at 79:3-80:7. Rodriguez said that Plaintiff sells "film repair kits," but she did not explain what comprises those kits and the trial record is otherwise silent as to them. *Id.* at 78:21-79:6. Another one of Plaintiff's witnesses, Janet Reith, testified – in conflict with Rodriguez's testimony – that Plaintiff does sell film as a separate product. *Id.* at 29:19-30:1. But Reith did not elaborate and her testimony was far less specific than Rodriguez's, so the Court does not credit it.

36

Virtually every factor relevant to the likelihood of confusion analysis requires consideration, to some degree, of the product at issue. Yet the trial evidence put at issue only one kind of product – a glassless mirror. Plaintiff briefly attempts to analyze the likelihood of confusion factors assuming the registration does not cover mirrors. But in doing so Plaintiff relies entirely on inapposite factual stipulations that the parties made concerning their respective sales of mirrors.[153] The record, for example, does not support Plaintiff's assertion that "the level of sophistication of the customers remains the same,"[154] as there is virtually no evidence regarding who purchases or would purchase the component film that Plaintiff uses to make its mirrors aside from a mirror manufacturer. Nor is there evidence that such film would be priced the same or sold through the same or related trade channels as finished mirrors.[155]

The Court assumes that Plaintiff is not precluded as a matter of law from asserting a Section 32(1) claim even if it does not sell or intend to sell film. But the Court finds that Plaintiff has failed to develop a factual record adequate to prevail on its Section 32(1) claim. This claim will be dismissed

---

[153]

*See* Dkt 151 at 2; *see also* Dkt 150 at 3.

[154]

Dkt 151 at 2.

[155]

*See id.* (attempting to rely on stipulations that the parties' products start at $50 and are sold through the same or similar channels); *see also id.* (arguing that "evidence of actual confusion . . . still exists" even though there is no evidence of buyers confusing Defendant's mirrors for Plaintiff's non-existent film product).

*V.      Remedy*

A court addressing an equitable claim must "mould [its] decree to the necessities of the particular case."[156]   In recognition of the "[f]lexibility" that undergirds a court's equity jurisdiction,[157] the Second Circuit, in the trademark context, has "rejected expressly an 'all-or-nothing' or per se rule mandating the use of an absolute injunction whenever likelihood of confusion is found."[158]   Rather, a district court must "balanc[e] the conflicting interests of the parties involved"[159] and "has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct."[160]

"In many circumstances a disclaimer can avoid the problem of objectionable infringement by significantly reducing or eliminating consumer confusion by making clear the source of a product."[161]   The Second Circuit has "cast doubt on the effectiveness of disclaimers in trademark infringement cases involving a substantial likelihood of consumer confusion,"[162] and in

---

[156]

*Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).

[157]

*Id.*

[158]

*Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1329 (2d Cir. 1987).

[159]

*McGregor-Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1140 (2d Cir. 1979), *superseded on other grounds by* Fed. R. Civ. P. 52(a).

[160]

*Spring Mills, Inc. v. Ultacashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir. 1983).

[161]

*Home Box Off., Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1315 (2d Cir. 1987); *see Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 273 (2d Cir. 2011) ("[W]e have frequently recognized that the use of a disclaimer sign can, in the right circumstances, be appropriate relief.").

[162]

*Soltex*, 832 F.2d at 1330.

such cases especially has required a defendant to produce evidence sufficient to demonstrate that a disclaimer would be effective in substantially reducing confusion.[163] But the Second Circuit has affirmed that a district court retains discretion to order disclaimers when "the likelihood of consumer confusion is far less than substantial."[164]

The Court rejects Defendant's argument that Plaintiff has failed to demonstrate that it is entitled to a permanent injunction. A finding actionable infringement gives rise to a presumption of irreparable harm.[165] That presumption is not rebutted by this record. Remedies at law would not be adequate to compensate Plaintiff for its unquantifiable "losses of reputation and goodwill and resulting loss of customers,"[166] and the issuance of a permanent injunction designed to reduce consumer confusion will serve the public interest.[167] But a careful balancing of the equities in this case counsels against an absolute prohibition on Defendant's use of LiteMirror.

First, for the reasons analyzed above, the Court finds only a "minimal to moderate amount of consumer confusion."[168] Although the products are identical, the marks are not identical and Plaintiff failed to adduce evidence significantly supporting the strength of its mark or

---

[163]    *See Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 143-44 (2d Cir. 2005); *ProFitness*, 314 F.3d at 71.

[164]    *Soltex*, 832 F.2d at 1330.

[165]    15 U.S.C. § 1116(a).

[166]    *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 464 (S.D.N.Y. 2017) (quoting *U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011).

[167]    *Stark Carpet Corp. v. Stark Carpet & Flooring Installations, Corp.*, 954 F. Supp. 2d 145, 164 (S.D.N.Y. 2013).

[168]    *Home Box Off.*, 832 F.2d at 1315 (citing *Soltex*, 832 F.2d 1325).

39

demonstrating that more than a *de minimis* amount of actual confusion has resulted from Defendant's years-long use of LiteMirror.  In addition, significantly supporting the likelihood of confusion finding is the similarity of the marks – a similarity which the Court finds can be substantially reduced through use of a disclaimer.  Defendant's evidence and arguments, in light of Plaintiff's weak proof, demonstrate that the risk of consumer confusion can be substantially reduced without banning Defendant from using its mark.

Second, the Court considers Plaintiff's significant and prejudicial delay in seeking injunctive relief against Defendant's use of LiteMirror.  Plaintiff has been on notice regarding Defendant's various uses of LiteMirror since Defendant's earliest days in 2008.  But after threatening litigation in 2008 and 2009, Plaintiff sat idly by as Defendant increased its use of LiteMirror over the years.  In November 2017, Defendant rebranded its website to feature "LiteMirror.com" as its most prominent identifying logo.  Yet Plaintiff still waited another nearly five and a half years after that to bring suit.  During those years, Defendant invested a significant six-figure sum in advertising the LiteMirror brand.  Although the Court finds that Defendant's bad faith precludes it from asserting laches as a complete bar to Plaintiff's claim, the prejudice attributable to Plaintiff's unreasonable delay in bringing suit remains a relevant consideration in balancing the equities.

Finally, the Court considers that this case ultimately involves "two companies fighting for possession of" an abandoned trademark "in an evident attempt for each to pass itself off as the abandoning company."[169]  Plaintiff was the first to appropriate MirrorLite after Hudson Photographic folded.  But "in light of the significant shipments and investment by [Defendant]," the

---

[169]  *Sutton Cosmetics (P.R.) Inc. v. Lander Co.*, 455 F.2d 285, 289 (2d Cir. 1972).

Court "do[es] not believe that [Plaintiff's] slight priority in time justifies awarding" the full extent of the relief Plaintiff seeks.[170]  Rather, the Court concludes that Defendant "entered the market sufficiently early" that the most equitable outcome is to allow Defendant to continue using LiteMirror so long as it "appropriately differentiat[es]" its product from Plaintiff's.[171]

In light of the foregoing, the Court will enjoin Defendant from using LiteMirror to market and sell glassless mirrors unless in every instance it is accompanied by an appropriate disclaimer.  The risk of confusion between the parties' marks derives in substantial part from the fact that one who encounters both may fail to grasp that the words "lite" and "mirror" have been swapped.  A disclaimer that references MirrorLite will avoid that risk.  The details of the required disclaimer and its placement and conspicuity remain to be determined.

---

[170] *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 630 (2d Cir. 1980).

[171] *P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.*, 462 F.2d 134, 136 (2d Cir. 1972).

41

## Conclusion

The foregoing constitutes the Court's findings of fact and conclusions of law. In light of the Court's conclusion that a permanent injunction requiring the use of a disclaimer should issue, it is hereby

**ORDERED** that Plaintiff, on five business days notice to Defendant, shall notice for settlement a proposed form of permanent injunction and judgment no later than May 11, 2026.

SO ORDERED.

Dated:        May 1, 2026
Corrected:   June 23, 2026

Lewis A. Kaplan
United States District Judge